# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

MARGUERITE A. TWEED,      )
                             )
           Plaintiff,      )
                             )
v.                             )
                             )      CIVIL NO. 04-0142
METRO MOTORS, SC, INC.,      )
                             )
           Defendant.     )
_____)

## MEMORANDUM OPINION

Finch, J.

        THIS MATTER comes before the Court on the Motion for Summary Judgment filed by Defendant Metro Motors, SC, Inc. [hereinafter "Metro Motors"].  Plaintiff Marguerite A. Tweed opposes such motion.

        Tweed charges Metro Motors with sex discrimination under Title VII of the Civil Rights Act of 1964, *codified as amended at* 42 U.S.C. § 2000e *et. seq.*, predicated both on the disparate treatment theory and under the hostile environment doctrine,  wrongful discharge in violation of 24 V.I.C. § 76, breach of an employment contract, breach of the implied covenant of good faith and fair dealing, and intentional and negligent infliction of emotional distress.[1]  Tweed seeks punitive as well as compensatory damages.

## I.    BACKGROUND

        The facts, taken in the light most favorable to Tweed, are as follows:

        Tweed was employed by Metro Motors, SC, Inc. in April 1999 as Office Manager.

---

[1] Tweed's allegation of gender discrimination in violation of Virgin Islands civil rights laws was previously dismissed.

Tweed Dep. 89:23-25.  Tweed holds a Bachelor of Science degree in accounting from Seton Hall University and her Masters' Degree in Business Administration from the University of the Virgin Islands. Id., 15:13-18; 16:20-24.  When Tweed was hired, the General Manager at the time, who was female, told Tweed how much she would be paid, that she would be given a demo vehicle to drive and that her health insurance would be partially paid by Metro Motors.[2] Id., 83:19-84:3; 84:22-85:4.  The then-General Manager also told her that Tweed would perform various sales manager functions, some accounting tasks, maintenance of the computer system, and some personnel responsibilities.  Id., 90:5-8.  Tweed supervised four to five employees.  Id., 91:10-23. The terms of employment were not written.  Id., 85:10-19; 90:14-16.

When a new Sales Manager was hired, Tweed's duties became more devoted to accounting.  Id., 93:20-94:5.  Tweed was manager of the accounting area.  Id., 103:15-16.

In 2002, the new, male General Manager assigned Tweed the accounting functions for Metro Motors VI, Inc., an affiliated dealership located in St. Thomas, in addition to the duties she had been performing for Metro Motors, SC.[3] Id., 94:13-14; 95:16-19.  This position had previously been performed on a part-time basis by the previous female General Manager of Metro Motors, SC.  Annis Aff., ¶ 3.  Before asking Tweed to take on the Metro Motors, VI accounting duties, a full-time female employee was hired to perform that function, but that employee's performance was inadequate.  Tweed Dep, 97:1-6.  The General Manager

---

[2]  "A demo is a new car that is given to an employee to drive for a certain number of miles, and then they sell it to the public as a new car." Tweed Dep. 86:12-14.

[3]  Defendant Metro Motors, SC, Inc. has not raised as a defense that Metro Motors, VI, Inc. is a separate employer.  Thus, the Court assumes that Metro Motors, SC, Inc. and Metro Motors, VI, Inc. are a single employer or substantively consolidated for Title VII purposes.  See Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 88 (3d Cir. 2003); see Annis Aff., ¶ 1.

2

"approached Marguerite about taking over the comptroller duties" because he was "aware of Marguerite's accounting and business background."  Annis Aff., ¶ 5.  He explains: "I thought that I would 'give her a shot' at the position."  Id.  Tweed became responsible for development of financial statements, including reconciling accounts and doing the books for Metro Motors, VI. Tweed Dep. 95:24-96:6.

With the increase in responsibilities, Tweed received a substantial increase in her monthly salary and a percentage of the profit.  Id., 96:7-12.  Tweed understood that she would be performing these new duties on a permanent basis.  Id., 96:16-23.  She was never advised that this position was temporary.  Id., 117:15-16.  In fact, Tweed states that the General Manager specifically told her that he was not going to take her duties away from her.  Id., 161:25-162:2.

In 2003, the General Manager relieved Tweed from her accounting responsibilities for Metro Motors, VI and gave them to a male employee without any explanation to Tweed.  Id., 98:17-99:4, 100:1-6.  The male employee had been working for Metro Motors, VI for about a month before he assumed Tweed's accounting function.  Id., 99:15-23.  He was not hired to work in accounting, nor did he have any Ford dealer accounting experience.  Id., 162:12-17, 164:23-24.  Indeed, upon hiring this new male employee, the General Manager told Tweed, "I don't know where I'm going to put him, but I'm going to put him somewhere."  Id.  The General Manager explained that he and the new employee were from the same southern state.  Id., 164:23-24.  Tweed believes that the General Manager hired this new employee not only because he and the new employee hailed from the same state, but also because the new employee was a man.  Id., 178:15-179:6.

The General Manager avers that Tweed's position was never intended to be permanent

3

and that even after assigning her St. Thomas comptroller duties, he continued to look for a permanent comptroller.  Annis Aff., ¶ 5.  He states that he had personality conflicts with Tweed and that she exhibited erratic and volatile behavior.  Id., ¶ 8.  He indicates that "[a]lthough her accounting skills were generally adequate, she consistently made errors that required outside auditors to make year-end adjustments in order to bring the books back into balance."  Id., ¶ 9. According to the General Manager, the man that took over Tweed's St. Thomas duties had extensive experience in automotive dealership accounting.  Id., ¶ 13.

According to Tweed, female employees were regularly treated differently than male employees at Metro Motors.  Pay scales were different for men and women.  Tweed Dep. 118:6-7.  A male service manager in St. Thomas earned $1,000 a week plus commission, while a female service manager in St. Croix was paid only $400 a week plus commission.  Id., 153:9-23, 154:16-21.  The male service manager had not been working for Metro Motors for very long and was doing a bad job.  Id., 154:24-155:13.  The female service manager, who was paid so much less, was doing a lot of the male service manager's work in addition to her own and had been working for Metro Motors for many years.  Id., 154:24-155:1; 155:20-156:2.

As another related example, a male sales manager would receive big commissions that he hadn't earned and the same female service manager, who was paid only $400 weekly plus commissions, was only given exactly what she produced.  Id., 157:6-10.  The General Manager told Tweed that he paid the male sales manager so much more because the male sales manager had to make a living.  Id., 157:10-14.

From Tweed's estimation, male-female pay discrepancies were rife.  A male service writer was paid $600 a week with no service writer experience.  Id., 158:2-18.  His female

4

counterpart was paid only $8.00 an hour.  Id., 158:16-25.  Not until the female service writer

confronted the General Manager was she finally given a commission.  Id., 158:1-2; 158:19-25.

Along the same lines, a male sales person was made into sales manager and received a

much higher salary than a woman sales person who later took the position of sales manager.  Id.,

180:23-181:10.  When the General Manager was reviewing the financial statement to justify

increasing the male sales manager's income, he said that it was because that employee had to

make a better living.  Id., 181:16-19.  Tweed remarked that "everyone needs to make a decent

salary."  Id., 191:19-20.  The General Manager did not comment.  Id., 181:20-23.

Other benefits for the men and women working for Metro Motors were not the same.

Female employees often had to relinquish their demo vehicles, while male employees were not

asked to do so.  Id., 159:17-21.

Metro Motor's General Manager treated male employees differently than he treated

female employees.  He admitted to Plaintiff that he was a male chauvinist and that he had to

correct that behavior.[4]  Id., 118:3-14.  The General Manager spoke to the men in a friendlier

manner than to the women.  Id., 165:6-12.  The women were under constant scrutiny and he

offered them no support.  Id., 165:12-15.  When it came to male employees, he would "let

something slide and not really care about the outcome or the behavior of the employee."  Id.,

168:10-13.  Tweed describes the General Manager's demeanor toward her as rude and

disrespectful, but never profane.  Id., 109:7-16, 113:9-10, 113:22-24.

According to Tweed, the General Manager displayed his chauvinistic behavior to her

---

[4] The General Manager flatly denies making any sexist or otherwise inappropriate
comment.  Annis Aff. ¶ 15.

when he took her Metro Motors VI job away from her and gave it to a man for no reason other than that he was a man. Id., 118:23-24. In addition, Tweed learned that the General Manager had derided the female service manager by saying to a Metro Motors' employee, something to the effect of "she's doing a good job for a girl." Id. 156:3-21.

Plaintiff resigned not only because of the decrease in compensation that accompanied the end of her St. Thomas accounting responsibilities, but also because the General Manager placed limitations on her demo vehicle use, which ultimately required her to obtain her own vehicle. Id., 165:19-21. Employees would return their demo cars after driving them no more than about four thousand miles, or sooner when a customer wanted to purchase the vehicles. Id. 86:15-22. When Tweed initially was given a demo car, no restrictions were placed on its use. Id., 86:23-25. However, Tweed admits that common sense dictates that the demo car would have to be kept in good shape so that the company could still make a profit by selling it as a new car. Id., 87:1–88:11.

The General Manager had accommodated Tweed by providing her with a truck or SUV for carrying animal feed for her horse and two dogs until around the time that she was relieved of her St. Thomas accounting duties. Id., 57:12-18, 159:23-160:12. The General Manager told Tweed that she could no longer use a demo vehicle to carry any kind of animal feed. Id., 139:7-9. After that, Tweed was given only sedans; no kind of vehicle which she could use to transport animal feed. Id., 143:19-23.

The General Manager gave as his reason for this restriction that a customer had complained that her vehicle was dirty. Id., 139:21-25. In general, an employee would be notified ahead of time when a customer was interested in test driving the assigned demo vehicle.

6

Id., 88:10-89:12.   In this one instance the customer had wanted to test drive her vehicle immediately and insisted on doing so even after being informed that it had not been readied.  Id., 140:7-13.  After test driving the vehicle twice, the same customer purchased it.  Id., 142:10-23.  Every other demo that had been assigned to Tweed was sold without customer complaints.  Id., 140:4-6.

Tweed testified that she was humiliated, suffered emotional upset and experienced mental stress and loss of sleep as a result of the way that she was treated while working for Metro Motors.  Id., 173:9-20, 177:1-25.  She resigned from Metro Motors in February 2004 because she could not survive on the reduced compensation.  Id., 153:22-25, 166:21-167:5.

## II.   SUMMARY JUDGMENT STANDARD

The Court may only grant summary judgment if it appears that "there is no genuine issue of any material fact and that [Defendant is] entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding this summary judgment motion, the Court views the facts presented in the light most favorable to Tweed and draws all inferences in her favor.  See Marzano v. Computer Science Corp. Inc., 91 F.3d 497, 501 (3d Cir. 1996).

## III.   TITLE VII CLAIM – DISPARATE TREATMENT CLAIM

A.   Burdens of Production and Persuasion in Discrimination Cases

One of Tweed's discriminations claim is based upon the disparate treatment theory of discrimination.  "'Disparate treatment' such as is alleged in the present case is the most easily understood type of discrimination.  The employer simply treats some people less favorably than

7

others because of their race, color, religion, sex, or national origin.  Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." International Broth. of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977) (quoted in Hampton v. Borough of Tinton Falls Police Dept, 98 F.3d 107, 112 (3d Cir. 1996)).

Disparate treatment claims are divided into two categories depending on whether there is sufficient direct evidence to show that discrimination was a motivating factor in the employer's adverse employment decision, or whether the only evidence of discrimination is circumstantial. In Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) the Supreme Court established a test that applies when there is direct evidence of discrimination, which is often referred to as a "mixed-motives" test.  When the evidence is circumstantial, requiring an inference of discrimination, the burden-shifting framework developed by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792 (1973), Texas Department of Community Affairs v Burdine, 450 U.S. 248 (1981) and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1983), often referred to as the "pretext" test, applies.

A plaintiff is not required to choose one of these liability theories at the summary judgment stage.  See Armbruster v. Unisys Corp., 32 F.3d 768, 781 n.17 (3d Cir. 1994).  The case must go forward if the plaintiff's claim would survive under either theory.  Id.  "[B]efore granting summary judgment and removing a case from the hands of a jury, the District Court ought to consider whether a plaintiff's claim would survive under either a pretext or *Price Waterhouse* theory."  Hankins v. City of Philadelphia, 189 F.3d 353, 364 n.6 (3d Cir. 1999).

1.     Direct Evidence of Discriminatory Animus

When a plaintiff has direct evidence of discriminatory intent, the case is appropriately analyzed under the "mixed motives" analysis established by the Supreme Court in Price Waterhouse, 490 U.S. at 258, as modified by section 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m) (the "1991 Act").  Under the modified Price Waterhouse standard, a defendant is liable for discrimination upon proof that a forbidden criterion (e.g., race) "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).  Thus, once a plaintiff shows that there is a genuine issue of material fact as to whether a forbidden criterion was a motivating factor for an employment practice, the burden of production and persuasion shift to the defendant, and summary judgment must be denied.  Hankins, 189 F.3d at 368 n.8 (discussing J. Cowen's view); see Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).  In the words of the Third Circuit Court of Appeals:

> [I]n cases where the plaintiff offers "direct evidence" of unlawful discrimination and the evidence as a whole permits a conclusion that both permissible and impermissible considerations played a role in the employer's decision, the plaintiff need only show that the unlawful motive was a substantial motivating factor in that decision. If the finder of fact concludes that the plaintiff has carried this burden, the burden of persuasion shifts to the defendant to prove that the unlawful motive was not a but-for cause, i.e., that the same action would have been taken, because of legitimate considerations, in the absence of the [un]lawful motive.

Wilson v. Susquehanna Tp. Police Dept., 55 F.3d 126, 129 (3d Cir.1995) (quoting Miller, 47 F.3d at 594).  If the defendant can show that it would have taken the same adverse action absent discriminatory animus, the plaintiff will be precluded from seeking damages or reinstatement, but may still be entitled to declaratory relief, certain injunctive relief, as well as attorney's fees. Hankins, 189 F.3d at 364, 368 n.8;  42 U.S.C. § 2000e-5(g)(2)(B).

To trigger a Price Waterhouse direct evidence analysis, the employee must be able to point to "conduct or statements by people involved in the decision-making process that may be viewed as directly reflecting a discriminatory attitude."  Starceski v. Westinghouse Electric Corp., 54 F.3d 1089, 1096 (3d Cir. 1995);  Griffiths v. Cigna Corp., 988 F.2d 457, 470 (3d Cir. 1993).  If the evidence can "fairly be said to directly reflect the alleged unlawful basis for the adverse employment decision," the Price Waterhouse analysis applies, even if the evidence is circumstantial.  Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997) (quotation omitted).  However,  "[the Third Circuit has] consistently held that a plaintiff who contends that he or she has direct evidence of discrimination to warrant treatment under Price Waterhouse faces a heavy burden."  Hankins, 189 F.3d at 364.  When the Court denies summary judgment under a Price Waterhouse analysis, the plaintiff may still pursue a pretext theory at trial.  Id. at 369 n.9.

An employer's admission of male chauvinism is direct evidence of sex discrimination.  In Krump v. Xyvision, Inc., 733 F. Supp. 554, 560 (E.D.N.Y. 1990) for example, plaintiff was discouraged from taking a certain account manager position because the regional manager was said to be "a male chauvinist who needed to get used to the idea of a woman."  Similarly, in Smolsky v. Consolidated Rail Corp., 780 F. Supp. 283, 295 (E.D. Pa. 1991), statements made by defendant's employee regarding his status as a "male chauvinist pig" contributed to the inference that the harrassment and discrimination was intentional and based on the fact that the plaintiff was a woman.  Statement such as "she was making too much money in that position as a woman" and that the termination was related to an "old boy's network" constitute direct evidence that an adverse employment decision was based on gender.  Finan v. Union Central Life Ins. Co., 2000

WL 262367, *1 (Ohio Ct. App.  Mar. 10, 2000).

According to Tweed, Metro Motors' General Manager publicly announced his chauvinism against women.  He also made derogatory remarks about one woman, implying that, although the woman's work was good, if she had been a man, her work would have been better or that he would have had higher expectations of her.  This reflects a discriminatory intent and triggers the <u>Price Waterhouse</u> direct evidence analysis.

The General Manager's attitude toward women affected Tweed's conditions of employment.  He relieved Tweed of a portion of her accounting responsibilities and gave them to a man whom he led Tweed to understand had less directly applicable accounting background.  When the General Manager had first decided to hire this man, he remarked to Tweed that he wanted to hire him, but had not identified a position for him.  The General Manager left Tweed with the impression that one of the reasons that he wanted to hire the new employee was because he was a man.  Other statements by the General Manager evidence a lack of concern for the livelihood of female employees.  Such lack of concern resulted in a substantial decrease in Tweed's benefits.  Because of his attitude toward the female employees in general, the General Manager also failed to give serious consideration to the hardship that the restriction on demo vehicle use would have on Tweed.

Thus, Tweed has shown that there is a genuine issue of material fact as to whether a forbidden criterion was a motivating factor for Metro Motors' employment practices which ultimately resulted in her seeking other employment.  Although permissible considerations set forth by Metro Motors may also have played a role in the General Manager's decision, a reasonable jury could find that the unlawful motive – gender discrimination – was a substantial

motivating factor in the decision.  This shifts the burden of production and persuasion to Metro Motors, so that summary judgment must be denied.

2.     Circumstantial Evidence of Discrimination

In McDonnell Douglas Corp., 411 U.S. at 802, the Supreme Court first delineated the basic allocation of burdens and order of presentation of proof in a discrimination action premised on circumstantial evidence.  The McDonnell Douglas system for allocating burdens applies in Title VII cases.  Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 318 (3d Cir. 2000). The plaintiff must first prove a prima facie case of discrimination by a preponderance of the evidence.  McDonnell Douglas, 411 U.S. at 802.  Such a prima facie case is established when a plaintiff has shown that (1) she is a member of a protected class, and (2) is qualified for the position but (3) was either not hired or fired from that position; (4) under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is ultimately filled by a person not of the protected class.  Id.;  Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1066, n.5 (3d Cir.1996);  Waldron v. SL Industries, Inc., 56 F.3d 491, 494 (3d Cir. 1995).

If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged action.  McDonnell Douglas, 411 U.S. at 802.  Finally, should the defendant carry this burden, "the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons, permitting the inference of intentional discrimination; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993) and Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992)).

13

In <u>Watson v. Southeastern Penn. Transp. Auth.</u>, 207 F.3d 207, 215 (3d Cir. 2000) the Third Circuit emphasized that to find discrimination under the <u>McDonnell Douglas</u> test, the plaintiff must show that the protected trait was "a determining factor" rather than only a "substantial motivating factor" as when <u>Price Waterhouse</u> applies.   Proof of discriminatory intent can be inferred from differences in the employer's treatment of employees within the protected groups as compared to employees outside the protected groups.  <u>Hampton</u>, 98 F.3d at 112.

The plaintiff bears the ultimate burden to prove that the defendant's legitimate nondiscriminatory reason is a pretext and the real reason for an adverse action is unlawful, intentional discrimination.  <u>Fuentes</u>, 32 F.3d at 763.  When the plaintiff offers evidence that would allow reasonable minds to conclude that the evidence of pretext is more credible than the employer's justifications, the employer's motion for summary judgment must be denied.  <u>Iadimarco v. Runyam</u>, 190 F.3d 151, 166 (3d Cir. 1999).

"[P]roof of a discriminatory atmosphere may be relevant in proving pretext since such evidence does tend to add color to the employer's decision-making processes and to the influences behind the actions taken with respect to the individual plaintiff."  <u>Antol v. Perry</u>, 82 F.3d 1291, 1302 (3d Cir. 1996) (quotation omitted).  Therefore, evidence revealing inconsistencies in statements or procedures, or revealing a hostile environment, along with the same evidence used to support the prima facie case, may be relied on to show pretext.  <u>Id.</u>; <u>see</u> <u>Kerzer v. Kingley Manufacturing</u>, 156 F.3d 396, 402-03 (2d Cir. 1998).

For the purposes of this motion, Metro Motors does not contest that Tweed has established a prima facie case of gender discrimination with regard to Tweed's discharge from

14

her St. Thomas position.  Mot. for Summ. J. at 7.  Thus, the burden shifts to Metro Motors.

Metro Motors has articulated a legitimate, nondiscriminatory reason for relieving Tweed of her St. Thomas accounting responsibilities.  According to Metro Motors, it replaced Tweed because it had only intended that Tweed take care of St. Thomas temporarily.  Her services were no longer needed once someone in St. Thomas was able to perform that function.  Metro Motors also indicates that it had behavioral and performance issues with Tweed.

According to Tweed, a reasonable juror could conclude, based upon direct and indirect evidence, that Metro Motors' stated reason is merely pretext.  First, Tweed was never told that the job was temporary or that she had any performance deficiencies.  Second, Metro Motors had a history of paying women less than men and intruding on women's benefits, such as the uninterrupted use of a demo vehicle.  Finally, the General Manager indicated to Tweed that he was a male chauvinist, which tends to show that Tweed was replaced by a man because he was a man, rather than for the reasons that Metro Motors has articulated.

Tweed has offered evidence that would allow a reasonable mind to conclude that Metro Motor's articulated reasons for a substantial drop in her responsibilities and compensation are pretextual.  Thus, summary judgment is not warranted under the McDonnell Douglas analysis either.

Tweed has established a prima facie case concerning the restrictions placed on her demo vehicle.  She is female, was originally given a demo vehicle to use without restrictions, restrictions were later placed on the vehicle and restrictions were not placed on anyone else's vehicle – male or female.  Metro Motors claims that such restrictions were placed on Tweed's vehicle because customers complained about the animal feed.  Tweed's evidence that this is

15

pretextual is strong.  Every vehicle that Tweed was assigned was sold.  As was customary, Tweed, except in one instance, had an opportunity to clean her car before it was test driven.  To Tweed's knowledge, only one customer ever made a complaint and he bought the vehicle notwithstanding.  Thus, a reasonable jury could find that the articulated reasons were pretext and that, therefore, gender discrimination was "a determining factor" in the General Manager's decision to restrict Tweed's demo car use, knowing that this would force her to purchase her own vehicle.

## IV.    TITLE VII - HOSTILE WORK ENVIRONMENT

Title VII of the Civil Rights Act prohibits a "hostile work environment."  Harris v. Forklift System, Inc., 510 U.S. 17, 21 (1993).  A hostile work environment is "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Id. at 22. "[T]o fall within the purview of Title VII, the conduct in question must be severe and pervasive enough to create an 'objectively hostile or abusive work environment – an environment that a reasonable person would find hostile – and an environment the victim-employee subjectively perceives as abusive or hostile.'"  Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001) (quoting Harris, 510 U.S. at 21-22).  "In determining whether an environment is hostile or abusive, [the court] must look at numerous factors, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance."  Id. (quotation omitted).

The statements that Tweed identifies as creating a hostile work environment were

16

infrequent and lacking in severity.  They were not physically threatening or humiliating.  Tweed

does not complain that they interfered with her work performance.  Thus, although the comments

were deplorable, the evidence viewed in its totality is insufficient for a reasonable jury to find a

hostile work environment.

## V.       WRONGFUL DISCHARGE ACT

Metro Motors contends that because Tweed's position had a supervisory component, she

is not protected by the Virgin Islands Wrongful Discharge Act, 24 V.I.C. § 76.  Tweed does not

contest Metro Motors' characterization of her position, but relies on this Court's ruling in

Jagroop v. Island Fin. V.I., Inc., 240 F. Supp.2d 370, 372 (D.V.I. 2002).   The Court considers its

holding in Jagroop to have been overruled by the Third Circuit's decision in St. Thomas-St. John

Hotel & Tourism Ass'n. Inc. v. Government of U.S. Virgin Islands ex rel. Virgin Islands Dept. of

Labor, 357 F.3d 297, 304 (3d Cir. 2004).  The Wrongful Discharge Act does not apply to

supervisors.   Because the parties do not dispute whether Tweed was a supervisor, summary

judgment is granted on Tweed's claim that she was constructively discharged in violation of the

Wrongful Discharge Act.

## VI.      BREACH OF EMPLOYMENT CONTRACT

"[T]he hiring of an employee by an employer occurs by contract."  Wilder v. Cody

Country Chamber of Commerce,  868 P.2d 211, 216 (Wyo. 1994).  "The contract of employment

is created by either an express contract or a contract implied in fact.  Express contracts are ones

in which the terms are declared by the parties either in writing or orally at the time the contract is

formed."  Id.                  .

An express oral contract was formed when Metro Motors offered employment to Tweed and Tweed accepted. The terms of the contract, the rate of pay, benefits and duties were established orally. Tweed supplied the consideration by performing her duties as an employee. See Restatement (Second) of Contracts § 71. The oral contract was modified when Tweed assumed additional duties in St. Thomas for additional compensation.

The contract of employment was for an indefinite duration, meaning that either party could terminate the contract at any time, for any reason, good or bad, or for no reason at all. See Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 350 n.2 (3d Cir. 1999). Because the employment contract was at-will, Metro Motors further unilateral modifications of the employment contract in relieving Tweed of her St. Thomas responsibilities and restricting her vehicle use did not violate the employment contract.

## VII.    BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

In the Virgin Islands every employment contract, even an at-will employment contract, "carries the obligations of good faith and fair dealing." Bostic v. AT&T of Virgin Islands, 2003 WL 25322909, *7 (D.V.I. Apr. 16, 2003); see Restatement (Second) of Contracts § 205. However, "to set forth a claim for breach of the implied covenants of good faith and fair dealing, [Tweed] must allege acts amounting to fraud or deceit on the part of the employer." Id. (quotation omitted).

Here, Tweed does not allege any fraud of deceit against the General Manager related to the decision to remove her St. Thomas duties. As a matter of fact, she indicates that the General Manager gave her no reason whatsoever for discontinuing her St. Thomas position. Thus, Metro

Motors did not breach the implied covenant of good faith and fair dealing in ending her St. Thomas accounting function.

The General Manager, however, did tell her that he was restricting her use of the demo vehicle because a customer complained that it was dirty.  Tweed evidently believes that the General Manager did not restrict her use as a result of a customer complaint.  She claims that the same customer who the General Manager stated was unsatisfied actually purchased her demo vehicle and that all of her demo vehicles were sold as new after she used them.  According to Tweed, the General Manager misrepresented his real reason for restricting her use of the vehicle to such an extent that she would be forced to buy her own vehicle.  A reasonable juror could find that the General Manager breached the implied covenant of good faith and fair dealing, by deceiving Tweed as to the true reason for his restricting her usage of a demo vehicle.

## VIII.   NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL HARM

For the Court to find that the Metro Motors negligently caused Tweed to suffer emotional distress, Tweed must show, among other elements, that the negligent conduct resulted in physical harm.  See Restatement (Second) of Torts §§ 313, 436A.  Tweed felt humiliated, suffered emotional upset and experienced mental stress and loss of sleep as a result of the way that she was treated while working for Metro Motors.  Such reaction is not serious or severe enough to constitute physical symptoms of emotional distress.  Accord Nicholas v. Wyndham Intern., Inc., 2007 WL 4201032, *7 (D.V.I. Nov. 13, 2007) ("Claims of mental anguish and loss of enjoyment of life do not suffice in the Virgin Islands to show physical injury for purposes of negligent infliction of emotional distress.").  Therefore, Metro Motors cannot be held liable for negligent

infliction of emotional distress.

The tort of intentional infliction of emotional distress arises when the defendant "by extreme and outrageous conduct causes severe emotional distress."  Restatement (Second) of Torts § 46(1).  "Liability has been found only when the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Id., cmt. d.  The General Manager's gender-biased comments, rude attitude, and disparate treatment of women, without more, do not rise to the level of outrage for a reasonable jury to find intentional infliction of emotional distress.

## IX.    PUNITIVE DAMAGES

To recover punitive damages for her Title VII claim, Tweed must demonstrate that Metro Motors "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C.A. § 1981a(b)(1).  "An employer may be vicariously liable for the discrimination of its employee if the employee was serving in a 'managerial capacity' and committed the wrong while 'acting in the scope of his employment.'"  Ridley v. Costco Wholesale Corp., 217 Fed. Appx. 130, 137 (3d Cir. 2007) (citing Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 542 (1999)).  Thus, Metro Motors may be held liable for punitive damages since the alleged discriminating actor was Metro Motors' General Manager.  Moreover, Metro Motors has not suggested that it has made any "good-faith efforts to comply with Title VII" which could protect it from punitive damages.  See Kolstad, 527 U.S. at 545.  The Court will withhold consideration of whether a reasonable jury

20

could find that Metro Motors exhibited malice or reckless indifference to Tweeds' civil rights until the conclusion of the presentation of evidence at trial.

**X.      CONCLUSION**

For the foregoing reasons, the Court denies summary judgment on Tweed's Title VII claim based on disparate treatment and will allow it to go forward under either the Price Waterhouse direct evidence theory or the McDonnell Douglas circumstantial evidence theory. However, summary judgment is granted as to Tweed's Title VII hostile environment claim. Because the parties do not dispute that Tweed was employed as a supervisor, summary judgment is granted on her wrongful discharge claim because she is not protected by the Virgin Islands Wrongful Discharge Act.  In that Tweed was an at-will employee, summary judgment is granted on her breach of contract claim.  However, her breach of the implied covenant of good faith and fair dealing survives concerning any deception on Metro Motors' part in its reasons for restricting her use of the demo vehicle.  Tweed has not shown physical symptoms of emotional distress caused by her employment at Metro Motors, so that summary judgment is granted on her claim for negligent infliction of emotional distress.  Summary judgment is also warranted on Tweed's claim for intentional infliction of emotional distress because the evidence is not sufficient for a reasonable juror to find Metro Motors' conduct outrageous.  Finally, punitive damages are available to Tweed for Metro Motors' Title VII violation, but the Court will await the conclusion of the evidence to decide whether to let Tweed's claim for punitive damages go to the jury.

ENTER:

DATE:        February 26, 2008                    _____/s/_____
                                                  RAYMOND L. FINCH
                                                  DISTRICT JUDGE